IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ENRIQUE J. GRIEGO, M.D.,           §
Individually and on Behalf of      §
All Others Similarly Situated,     §
as well as on Behalf of the        §
General Public and Acting          §
on the Public Interest,            §
                                   §
                    Plaintiff,     §
                                   §  Civil Action No. 3:07-CV-1708-D
VS.                                §
                                   §
MICHAEL O. LEAVITT, Secretary,     §
United States Department of        §
Health & Human Services,           §
et al.,                            §
                                   §
                    Defendants.    §

MEMORANDUM OPINION
AND ORDER

Defendants' motions to dismiss principally present the question whether the claims of plaintiff——a physician who treats Medicare patients——arise under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* ("Medicare Act") and, if so, whether he is exempt from 42 U.S.C. § 405(g)'s requirement that he channel his claims through the Medicare Act administrative appeals process or whether that requirement should be waived. Concluding that the physician's claims arise under the Medicare Act and that he must exhaust them administratively, the court grants defendants' motions to dismiss for lack of subject matter jurisdiction and dismisses this case without prejudice.

Plaintiff Enrique J. Griego, M.D. ("Dr. Griego") is the owner of a medical clinic that provides medical services under the Medicare program. TrailBlazer Health Enterprises, LLC ("TrailBlazer") is a company under contract with the Department of Health and Human Services ("HHS") that helps administer financial aspects of the Medicare program.[1] In June 2007 TrailBlazer notified Dr. Griego that his medical clinic had been overpaid $487,708.19 in Medicare benefits. TrailBlazer's overpayment determination was based on a statistical sampling in which the actual overpayment of Medicare benefits was $4,538.55. To reduce the alleged overpayment of $487,708.19, TrailBlazer applied $42,344.44 of Medicare benefits due and payable to Dr. Griego's clinic to reduce part of the alleged overpayment. TrailBlazer demanded that Dr. Griego repay the net sum of $445,363.75, and it apprised him of his right of appeal through the Medicare Act's administrative appeals process.[2]

---

[1]Fiscal intermediaries such as TrailBlazer "serve as claims managers for the Medicare program and make the initial determination regarding the amount of reimbursement to be paid to the health care provider." *Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 405 (6th Cir. 2007).

[2]A contractor's determination of an overpayment is considered an "initial determination" that is appealable under 42 U.S.C. § 1395ff. *See* 42 C.F.R. § 405.357 (2007) (characterizing determination of "overpayment" as an "initial determination"); 42 C.F.R. § 405.904(a)(2) (2007) (summarizing the five levels of appeal).

The first level of appeal of a contractor's initial determination of Medicare benefits is a redetermination by the contractor who made the initial determination. *See* 42 C.F.R. §§ 405.940-405.958 (2007). After the contractor has issued a redetermination, a provider may request a reconsideration with a qualified independent contractor ("QIC"). *See* 42 C.F.R. §§ 405.960-405.978 (2007). If a provider is dissatisfied with the QIC's reconsideration, at the third step it can request a hearing before an administrative law judge ("ALJ"). *See* 42 C.F.R. §§ 405.1000-405.1054 (2007). At the fourth step, a provider has the right to appeal the ALJ's decision to the Medicare Appeals Council ("MAC"). *See* 42 C.F.R. §§ 405.1100-1140 (2007). Only after the MAC renders a decision can a provider undertake the fifth step: challenge the initial determination concerning Medicare benefits in federal district court. *See* 42 C.F.R. §§ 405.1130, 405.1136 (2007).

After receiving TrailBlazer's notice of overpayment, Dr. Griego timely filed a request for redetermination with TrailBlazer, contending that it had relied on an improper sampling methodology in calculating the overpayment. In addition to challenging the overpayment determination, Dr. Griego contested—as an illegal recoupment[3] under 42 U.S.C. § 1395ddd(f)(2)(A)[4]—TrailBlazer's

---

[3]The Medicare regulations define recoupment as "[t]he recovery by Medicare of any outstanding Medicare debt by reducing present or future Medicare payments and applying the amount withheld to the

- 3 -

application of $42,344.44 of Medicare benefits owed to him to reduce the alleged overpayment. TrailBlazer denied Dr. Griego's request for redetermination. After TrailBlazer's denial, but before seeking reconsideration by the QIC (i.e., the second of the five steps), Dr. Griego filed this lawsuit.

Dr. Griego sues Michael O. Leavitt ("Secretary Leavitt"), in his individual capacity as the Secretary of HHS; Kerry N. Weems ("Administrator Weems"), in his individual capacity as the Administrator of the Centers for Medicare and Medicaid Services ("CMS"); Martha P. Mahaffey ("Mahaffey"), in her individual capacity as the President of TrailBlazer; Joy Bahnemann ("Bahnemann"), in her individual capacity as the President of

---

indebtedness." 42 C.F.R. § 405.370 (2007).

[4]Section 1395ddd(f)(2)(A) provides:

> In the case of a provider of services or supplier that is determined to have received an overpayment under this subchapter and that seeks a reconsideration by a qualified independent contractor on such determination under section 1395ff(b)(1) of this title, the Secretary may not take any action (or authorize any other person, including any medicare contractor, as defined in subparagraph (C)) to recoup the overpayment until the date the decision on the reconsideration has been rendered. If the provisions of section 1395ff(b)(1) of this title (providing for such a reconsideration by a qualified independent contractor) are not in effect, in applying the previous sentence any reference to such a reconsideration shall be treated as a reference to a redetermination by the fiscal intermediary or carrier involved.

TriCenturion, Inc., the company that allegedly helped TrailBlazer in calculating the overpayment determination; Kendall R. Walker ("Walker"), in his individual capacity as the Secretary of Q2 Administrators, LLC, a QIC that will handle Dr. Griego's anticipated reconsideration; and John Doe, all the unknown defendants who have aided the named defendants in violating the statutory prohibition against recoupment contained in 42 U.S.C. § 1395ddd(f)(2)(A).

Dr. Griego avers that defendants have acted under a clandestine HHS policy in authorizing recoupment prior to the reconsideration decision, in contravention of § 1395ddd(f)(2)(A). Dr. Griego first asserts a due process claim under the Fifth and Fourteenth Amendments on the basis that defendants have ignored Congress' directive in § 1395ddd(f)(2)(A) by prematurely recouping allegedly overpaid Medicare benefits. He also contends that defendants' conduct amounts to an unjust taking under the Fifth and Fourteenth Amendments and under Article 1, § 19 of the Texas Constitution. Dr. Griego asserts a claim under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), to collect money damages for defendants' alleged violations of his constitutional rights. He also brings a direct statutory claim for illegal recoupment under § 1395ddd(f)(2)(A). In addition to money damages, Dr. Griego seeks an injunction prohibiting defendants from recouping Medicare benefits before a QIC has

- 5 -

rendered a reconsideration decision, and a declaratory judgment that defendants have not complied with § 1395ddd(f)(2)(A).  Dr. Griego seeks to certify this lawsuit as a class action on behalf of all healthcare providers participating in the Medicare program, against whom defendants have unlawfully recouped overpayments before the providers obtained a reconsideration decision by a QIC, in violation of their constitutional and statutory rights.

The agency head defendants——Secretary Leavitt and Administrator Weems——move to dismiss Dr. Griego's complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, and under Fed. R. Civ. P. 12(b)(6) for a failure to state a claim on which relief can be granted.  In challenging the court's subject matter jurisdiction, defendants contend that Dr. Griego lacks standing because, under a proper construction of § 1395ddd(f)(2)(A), recoupment is prohibited only when a provider has filed for reconsideration, and Dr. Griego admits in his complaint that he has not reached the second stage of the administrative appeals process.  Defendants also invoke sovereign immunity as a bar to the court's subject matter jurisdiction. Last, defendants maintain that Dr. Griego's claims arise under the Medicare Act and are thus barred by 42 U.S.C. § 405(h) until he has exhausted his administrative appeals under § 1395ff.  Defendants contend that even if the court has subject matter jurisdiction, Dr. Griego cannot assert a *Bivens* claim in light of the available

administrative remedies, and that he has failed to state a claim for injunctive relief. Defendants Mahaffey, Bahnemann, and Walker move to dismiss on almost all of the same grounds, i.e., all but sovereign immunity. Dr. Griego moves for class certification under Rule 23. In deciding the pending motions, the court need only consider defendants' contention that the court lacks subject matter jurisdiction. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.").

## II

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). "It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking." *Id.* (internal quotation marks omitted). As the party asserting jurisdiction, Dr. Griego "bears the burden of demonstrating that jurisdiction is proper." *Id.*

## A

The court first decides whether it lacks subject matter jurisdiction on the ground that Dr. Griego has failed to exhaust

his administrative remedies under the Medicare Act.[5]  "[42 U.S.C. §] 1395ii makes [42 U.S.C.] § 405(h) applicable to the Medicare Act 'to the same extent as' it applies to the Social Security Act." *Shalala v. Ill. Council of Long Term Care, Inc.*, 529 U.S. 1, 9 (2000).  Section 405(h) provides:

> Finality of the [Secretary's] decision
>
>> The findings and decision of the [Secretary] after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein provided.  No action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on

---

[5]Even if Dr. Griego's complaint is properly dismissed for lack of standing, this defect is easily cured by amending the complaint. Defendants posit that Dr. Griego lacks standing because his complaint affirmatively establishes that he has not yet filed for reconsideration, and, properly construed, § 1395ddd(f)(2)(A) prohibits recoupment only *after* a provider has filed for reconsideration. Although Dr. Griego has submitted an affidavit in support of his response brief that states that he has now filed for reconsideration, this comes too late, because "standing is determined as of the date of the filing of the complaint." *Kitty Hawk Aircargo v. Chao*, 418 F.3d 453, 460 (5th Cir. 2005) (internal quotation marks omitted).  Nevertheless, assuming the court agreed with defendants' construction of § 1395ddd(f)(2)(A) and dismissed the case for lack of standing, Dr. Griego would be able to amend his complaint to allege that he had filed for reconsideration.  The court will therefore address first a challenge to its subject matter jurisdiction that, if approved, would support dismissal regardless whether Dr. Griego filed an amended complaint.  For similar reasons, the court will address defendants' exhaustion arguments before considering their sovereign immunity challenge, because only the agency head defendants assert sovereign immunity as a ground for dismissal.  A favorable ruling on the sovereign immunity issue would not result in dismissal of the entire lawsuit as to all defendants.

any claim arising under this subchapter.[6]

"The third sentence of 42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides that § 405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue for judicial review for all claims arising under the Medicare Act." *Heckler v. Ringer*, 466 U.S. 602, 614-15 (1984) (footnote, brackets, and internal quotation marks omitted); *Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 285 (5th Cir. 1999) (per curiam) ("Title 42 U.S.C. § 405(g) is the sole avenue for judicial review of all claims arising under the Medicare Act.").

42 U.S.C. § 405(g) permits judicial review only after the Secretary issues a "final decision" on the plaintiff's claims. "[T]he Secretary has provided that a 'final decision' is rendered on a Medicare claim only after the individual claimant has pressed his claim through all designated levels of administrative review." *Ringer*, 466 U.S. at 606. Thus if Dr. Griego's claims arise under the Medicare Act, the court lacks subject matter jurisdiction to the extent he predicates such jurisdiction on 28 U.S.C. § 1331, because Dr. Griego has failed to obtain a "final decision" of the Secretary on these claims.

---

[6]Section 1395ii's incorporation of § 405(h) provides that "any reference therein to the Commissioner of Social Security or the Social Security Administration shall be considered a reference to the Secretary or the Department of Health and Human Services, respectively."

Dr. Griego's complaint premises subject matter jurisdiction on 28 U.S.C § 1331 and *Bivens*. But *Bivens* does not provide an independent source of subject matter jurisdiction apart from § 1331. *See*, *e.g.*, *Myles v. United States*, 416 F.3d 551, 554 (7th Cir. 2005) ("Neither § 1983 nor *Bivens* creates federal-question jurisdiction, which rests on 28 U.S.C. § 1331 instead."). Because § 1331 provides the sole basis of subject matter jurisdiction for Dr. Griego's claims, if his claims arise under the Medicare Act, the court lacks subject matter jurisdiction.

The Supreme Court has construed the "arising under" language of § 405(h) broadly. *Ringer*, 466 U.S. at 615. In *Weinberger v. Salfi*, 422 U.S. 749 (1975), a Social Security case construing § 405(h), the Supreme Court held that the plaintiffs' claims arose under the Social Security Act, and were thus subject to § 405(h)'s jurisdictional bar, because "the Social Security Act . . . provides both the standing and the substantive basis for the presentation of their constitutional contentions." *Id.* at 760-61. The *Ringer* Court applied this same test in the context of the Medicare Act in holding that the plaintiffs' constitutional and statutory challenge to HHS's policy of not paying for a particular surgery arose under the Medicare Act. *Ringer*, 466 U.S. at 615. That the plaintiffs were not directly seeking Medicare benefits (only injunctive and declaratory relief) did not prevent their suit from arising under

the Medicare Act. *Id.* ("It is of no importance that [plaintiffs] here, unlike the claimants in *Weinberger v. Salfi*, sought only declaratory and injunctive relief and not an actual award of benefits as well."). The plaintiffs' suit was essentially one for benefits because, if plaintiffs were successful in obtaining equitable relief, only "ministerial details will remain before [they] would receive reimbursement" for the surgery at issue. *Id.*

In *Illinois Council* the Court affirmed § 405(h)'s wide reach. Because § 405(h) contains a jurisdictional bar, it "reaches beyond ordinary administrative law principles of 'ripeness' and 'exhaustion of administrative remedies[.]'" *Ill. Council*, 529 U.S. at 12.

> Insofar as § 405(h) prevents application of "ripeness" and "exhaustion" exceptions, *i.e.*, insofar as it demands the "channeling" of virtually all legal attacks through the agency, it assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts applying "ripeness" and "exhaustion" exceptions case by case. But this assurance comes at a price, namely, occasional individual, delay-related hardship. In the context of a massive, complex health and safety program such as Medicare, embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any of several different courts, paying this price may seem justified. In any event, such was the judgment of Congress as understood in *Ringer* and *Salfi*.

*Id.* at 13. In holding that plaintiffs' complaint "that certain

Medicare-related regulations violated various statutes and the Constitution" arose under the Medicare Act, the Court relied on the *Salfi* and *Ringer* test: whether the standing and the basis for the presentation of the plaintiff's claims was the Medicare Act. *Id.* at 5, 12. The court then elaborated on § 405(h)'s wide reach:

> [W]e cannot distinguish *Salfi* and *Ringer* from the case before us. Those cases themselves foreclose distinctions based upon the "potential future" versus the "actual present" nature of the claim, the "general legal" versus the "fact-specific" nature of the challenge, the "collateral" versus "noncollateral" nature of the issues, or the "declaratory" versus "injunctive" nature of the relief sought. Nor can we accept a distinction that limits the scope of § 405(h) to claims for monetary benefits. Claims for money, claims for other benefits, claims of program eligibility, and claims that contest a sanction or remedy may all similarly rest upon individual fact-related circumstances, may all similarly dispute agency policy determinations, or may all similarly involve the application, interpretation, or constitutionality of interrelated regulations or statutory provisions. There is no reason to distinguish among them in terms of the language or in terms of the purposes of § 405(h). Section 1395ii's blanket incorporation of that provision into the Medicare Act as a whole certainly contains no such distinction. Nor for similar reasons can we here limit those provisions to claims that involve "amounts."

*Id.* at 13-14.

A number of lower courts have applied the principles of *Ringer* and *Illinois Council* to cases involving allegations that HHS or Medicare contractors unlawfully attempted to collect alleged

overpayments of Medicare benefits.

In *Kaiser v. Blue Cross of California*, 347 F.3d 1107 (9th Cir. 2003), a fiscal intermediary notified the plaintiffs (the owners of a healthcare facility) that it was going to recoup over $1 million in overpayments without offering the plaintiffs an extended repayment plan. The plaintiffs sued the Medicare contractor for, *inter alia*, failing to offer them a repayment plan and for its sudden decision to recoup the overpayments, in violation of agency regulations and the plaintiffs' Fifth Amendment rights. *Id.* at 1111. Despite the plaintiffs' attempts to escape the reach of § 405(h) by bringing a claim for money damages rather than for the recovery of Medicare benefits, the court held that the plaintiffs' claims arose under the Medicare Act. *Id.* at 1112, 1114-1115. "The fact that the [plaintiffs] seek damages beyond the reimbursement payments available under Medicare does not exclude the possibility that their case arises under Medicare. Simply put the type of remedy sought is not strongly probative of whether a claim falls under § 405(h)." *Id.* at 1112. In concluding that the plaintiffs' claims were "inextricably intertwined" with a claim for Medicare reimbursement, the court reasoned that "[h]ad the [plaintiffs] been immediately granted a satisfactory [extended repayment plan], for example, or had they never accrued an overpayment in the first place, they never would have brought this case." *Id.*

*Fanning v. United States*, 346 F.3d 386 (3d Cir. 2003),

involved a provision of the Medicare Act that permits CMS to recover Medicare benefits already paid to individuals who have received from some other source a duplicate payment for the same medical treatment. *Id.* at 388. The Medicare regulations characterize these duplicate payments as "overpayments." *Id.* at 391. After the plaintiff received a tort settlement for injuries he sustained from a medical device, CMS took steps to recover the overpayment of Medicare benefits it had paid to the plaintiff to treat the same injuries caused by the device. *Id.* at 388-90. The plaintiff sued a host of defendants in federal district court, contending that the tort settlement was not the kind of payment that gave CMS the right to reimbursement under the Medicare Act, seeking to enjoin the defendants from unlawfully collecting the alleged overpayment, and requesting declaratory relief. *Id.* at 388, 390. The court concluded that "[t]he essence of the claim asserted in [the plaintiff's] amended class action complaint is that the government is not entitled to recover Medicare overpayments[.]" *Id.* at 399.

> It is thus apparent that both the standing and the substantive basis for the claim asserted in the amended class action complaint are rooted in, and derived from, the Medicare Act. Consequently, the claim is one "arising under" the Medicare Act and the third sentence of § 405(h) therefore deprived the district court of federal question jurisdiction.

*Id.* at 400.

In a factually similar case to Dr. Griego's suit, *Great Rivers*

*Home Care, Inc. v. Thompson*, 170 F.Supp.2d 900 (E.D. Mo. 2001), the plaintiff, a provider of Medicare services, sued his fiscal intermediaries "seeking injunctive relief from [their] attempts to recoup alleged Medicare overpayments." *Id.* at 901. The plaintiff maintained that the defendants' immediate recoupment of alleged overpayments——before the plaintiff could exercise its right to a hearing before the Provider Reimbursement Review Board——was a violation of its Fifth Amendment rights. *Id.* at 903-04. The plaintiff did not challenge the defendants' right to recoup alleged overpayments; rather, it argued that recoupment was lawful only at a particular stage of the administrative appeals process and that defendants' recoupment was premature. *Id.* The court held that the provider's suit arose under the Medicare Act, and thus § 405(g) required that plaintiff exhaust its administrative remedies. *Id.* at 904.

C

Based on the principles of *Ringer* and *Illinois Council* and the cases that apply them in the context of complaints alleging unlawful attempts to recover Medicare overpayments, the court holds that all of Dr. Griego's claims arise under the Medicare Act. "[B]oth the standing and the substantive basis for the presentation of [Dr. Griego's] claim[s] is the Medicare Act." *Ill. Council*, 529 U.S. at 12 (quotation marks omitted). Indeed, all of Dr. Griego's constitutional and statutory claims explicitly hinge on

§ 1395ddd(f)(2)(A).  Although the complaint avers that defendants have violated Dr. Griego's due process rights "by, *among other things*, ignoring the Congressional directive and violating the statutory prohibition set forth in 42 U.S.C. § 1395ddd," Compl. ¶ 40 (emphasis added), Dr. Griego does not identify any action other than premature recoupment as a basis for his constitutional claims.  As the cases make clear, Dr. Griego cannot circumvent the strictures of § 405(h) by presenting his complaint in constitutional terms.

Dr. Griego's insistence that his suit does not attempt to collect Medicare benefits is also misplaced.  Even if Dr. Griego sought only injunctive and declaratory relief, under *Ringer* and *Illinois Council* his claims would still arise under the Medicare Act.  As the Court noted in *Ringer*, Dr. Griego's attempt to obtain injunctive and declaratory relief is an indirect claim for Medicare benefits, because if Dr. Griego is successful in obtaining this relief, he will prevent defendants from applying amounts withheld from present or future Medicare benefits payable to his clinic to reduce the alleged overpayment indebtedness.  Dr. Griego's *Bivens* action seeks money damages that exceed the amounts that defendants have recouped or will recoup, but that distinction did not save the plaintiffs' complaint in *Kaiser*, 347 F.3d at 1112, and Dr. Griego presents no reason why this distinction supports a different result.  In sum, Dr. Griego's suit falls squarely within the

Medicare Act; therefore, the court lacks subject matter jurisdiction over this case until Dr. Griego satisfies the exhaustion requirement of § 405(g).

III

Dr. Griego maintains that, even if his claims arise under the Medicare Act, the court has subject matter jurisdiction despite his failure to exhaust his administrative appeals under § 1395ff because, under *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667 (1986), he is exempt from § 405(g)'s channeling requirement, and under *Mathews v. Eldridge*, 424 U.S. 319 (1976), he is entitled to a waiver of the exhaustion requirement.

A

Dr. Griego implicitly invokes the *Michigan Academy* exception to § 405(g)'s channeling requirement by arguing repeatedly in his response brief that there is no administrative remedy available for his claims. Dr. Griego therefore argues that applying § 405(g)'s channeling requirement would completely deprive him of judicial review.

The *Illinois Council* Court held that plaintiffs may avail themselves of the *Michigan Academy* exception to § 405(g) and (h) only when "application of § 405(h) would not simply channel review through the agency, but would mean no review at all." *Ill. Council*, 529 U.S. at 19. In other words, if requiring Dr. Griego to channel his claims through the administrative appeals process

- 17 -

"will amount to the practical equivalent of a total denial of judicial review," *id.* at 20 (quoting *McNary v. Haitian Refugee Center, Inc.*) (internal quotation marks omitted), he may bring a suit under § 1331 despite his failure to exhaust.

Dr. Griego insists that there is no available administrative remedy for unlawfully recouped overpayments under § 1395ddd(f)(2)(A). The court disagrees. The administrative appeals process embodied in § 1395ff and the related administrative regulations permit a provider of Medicare services to appeal an "initial determination" of Medicare benefits. 42 U.S.C. § 1395ff(a)(3); 42 C.F.R. §§ 405.906, 405.940 (2007). Dr. Griego recognizes that a Medicare contractor's overpayment determination is an "initial determination" that may be appealed through the appeals process provided by § 1395ff. *See* 42 C.F.R. § 405.357 (2007) (characterizing "overpayment" as an "initial determination"). He denies, however, that a Medicare contractor's decision to recoup overpayments in contravention of § 1395ddd(f)(2)(A) is an "initial determination" for which an administrative appeal lies. Although the administrative regulations do not explicitly provide that "recoupment" is an "initial determination" that is appealable under § 1395ff, in listing the "initial determinations" that *are* appealable, 42 C.F.R. § 405.924(b)(12) (2007) broadly includes "[a]ny other issues having a present or potential effect on the amount of benefits to be paid

under Part A or Part B of Medicare[.]" Recoupment—"[t]he recovery by Medicare of any outstanding Medicare debt by reducing present or future Medicare payments and applying the amount withheld to the indebtedness," 42 C.F.R. § 405.370 (2007)—would certainly have a "present or potential effect on the amount of benefits to be paid" Dr. Griego's clinic. This conclusion is buttressed by Dr. Griego's concesssion that, when he first filed for a redetermination under § 1395ff, in addition to disputing the amount of TrailBlazer's overpayment determination, he protested TrailBlazer's alleged illegal recoupment.

B

Assuming *arguendo* that the court is mistaken in its conclusion that administrative relief is available for recoupment that violates § 1395ddd(f)(2)(A), Dr. Griego's complaint still fails to qualify for the *Michigan Academy* exception to § 405(g)'s channeling requirement. In *Illinois Council* the Supreme Court rejected the plaintiff's contention that it could bypass § 405(g)'s channeling requirement simply because the plaintiff's legal claims were not cognizable in the administrative appeals process. *Ill. Council*, 529 U.S. at 22-24.

> The fact that the agency might not provide a hearing for that *particular contention*, or may lack the power to provide one, is beside the point because it is the "action" arising under the Medicare Act that must be channeled through the agency. After the action has been so channeled, the court will consider the contention when it later reviews the action.

> And a court reviewing an agency determination
> under § 405(g) has adequate authority to
> resolve any statutory or constitutional
> contention that the agency does not, or
> cannot, decide[.]

*Id.* at 23-24 (citations omitted); *Lifestar Ambulance Servs., Inc. v. United States*, 365 F.3d 1293, 1297 (11th Cir. 2004) ("[D]espite the fact that some claims, such as constitutional or statutory challenges, cannot be resolved administratively, they must still proceed first through the administrative process . . . . *Illinois Council*, thus, expressly holds that the vitality of the exhaustion requirement is not vitiated by statutory claims that cannot be resolved initially at the administrative level."). A plaintiff whose legal claims are outside the scope of the administrative appeals process must wait until the judicial forum to prosecute the claims, and this delay does not permit him to circumvent § 405(g)'s channeling requirement. *Ill. Council*, 529 U.S. at 22-23; *see also Great Rivers*, 170 F.Supp.2d at 906 ("There is a difference between total preclusion of review and postponement of review."). Even if Dr. Griego cannot redress his illegal recoupment claims within the Medicare administrative appeals process, he has not presented any argument that establishes why he would not be able to present them in federal district court after exhausting his administrative appeals for TrailBlazer's alleged overpayment determination. The *Michigan Academy* exception is therefore unavailable.

Dr. Griego also contends that the court has subject matter jurisdiction because he is entitled to a judicial waiver of § 405(g)'s exhaustion requirement based on the principles of *Mathews v. Eldridge*. In *Mathews*, a Social Security case, the Supreme Court defined the jurisdictional character of § 405(g), "which requires exhaustion of the administrative remedies provided under the Act as a jurisdictional prerequisite." *Mathews*, 424 U.S. at 327. The Court concluded, however, that obtaining judicial review under § 405(g) has two components, "only one of which is purely 'jurisdictional' in the sense that it cannot be 'waived' by the Secretary in a particular case." *Id.* at 328. "The nonwaivable element is the requirement that a claim for benefits shall have been presented to the Secretary. Absent such a claim there can be no 'decision' of any type. And some decision by the Secretary is clearly required by the statute." *Id.* "The waivable element is the requirement that the administrative remedies prescribed by the Secretary be exhausted." *Id.; see also Affiliated*, 164 F.3d at 285 ("[J]urisdiction under section 405(g) is determined under a two pronged test. First, there must have been a presentment to the Secretary. This element can never be waived and no decision of any type can be rendered if this requirement is not satisfied. Second, the claimant must have exhausted his administrative review." (citations omitted)). As to this second component, "the Secretary

may waive the exhaustion requirement if he satisfies himself, at any stage of the administrative process, that no further review is warranted either because the internal needs of the agency are fulfilled or because the relief that is sought is beyond his power to confer." *Mathew*, 424 U.S. at 330. But a court in an exceptional case may override the Secretary's decision not to waive the exhaustion requirement:

> [U]nder § 405(g) the power to determine when finality has occurred ordinarily rests with the Secretary since ultimate responsibility for the integrity of the administrative program is his. But cases may arise where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate.

*Id.*

Courts have gleaned three factors that the *Mathews* Court relied on in deciding whether to override the Secretary's decision not to waive § 405(g)'s exhaustion requirement: "(1) whether the claim is collateral to a demand for benefits; (2) whether exhaustion would be futile; and (3) whether the plaintiffs would suffer irreparable harm if required to exhaust their administrative remedies before obtaining relief." *Abbey v. Sullivan*, 978 F.2d 37, 44 (2d Cir. 1992); *see*, *e.g.*, *Kaiser*, 347 F.3d at 1115 (reciting the three *Mathews* factors); *Pavano v. Shalala*, 95 F.3d 147, 150 (6th Cir. 1996) (same); *Manakee Prof'l Med. Transfer Serv., Inc. v. Shalala*, 71 F.3d 574, 580 (6th Cir. 1995) (same). Because Dr.

Griego has satisfied the presentment requirement by filing an appeal under § 1395ff, the only issue remaining is whether the *Mathews* factors warrant treating TrailBlazer's redetermination as the Secretary's "final decision" for purposes of establishing subject matter jurisdiction under § 405(g). "Of course, these factors cannot be applied mechanically. Rather, their application must 'be guided by the policies underlying the exhaustion requirement.'" *Abbey*, 978 F.2d at 44 (quoting *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) (citation omitted)).

"Exhaustion is the rule, waiver the exception. This is so because of a variety of prudential and separation-of-powers concerns." *Id.* (citations omitted); *Ringer*, 466 U.S. at 618 (stating that judicial waiver of exhaustion requirement under *Mathews* is reserved for "certain special cases").

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

*Salfi*, 422 U.S. at 765. "Giving the agency the first crack at correcting its own errors also conserves judicial resources." *Abbey*, 978 F.2d at 45. "This interest in avoiding premature judicial intervention applies with even greater force when administrative resolution of plaintiffs' claims may, as in this

case, enable the agency to resolve the case on nonconstitutional grounds, a result generally favored by federal courts." *Id.*

"The Supreme Court has recognized that the constitutional tenor of a claim is not a determinative factor in deciding whether a claim is collateral." *Affiliated*, 164 F.3d at 286. In *Affiliated* a Medicare healthcare provider filed suit against HHS and other government agents alleging that they had conspired to violate the provider's right to due process and equal protection under the Constitution by arbitrarily enforcing various Medicare rules on the basis of race. *Id.* at 283-84. The Fifth Circuit held that the provider's claim was not collateral to a claim for benefits:

> On the facts of this case [the provider's] claim is not a collateral claim for purposes of exhaustion. Although its claim is framed in constitutional terms and seeks compensatory and punitive damages, [the provider] also seeks to rescind the termination of its provider status and to halt the suspension of its Medicare payments. Such relief is unquestionably administrative in nature.

*Id.* at 285.

In *Great Rivers*, a case that involved a legal claim very similar to Dr. Griego's, the court concluded that the plaintiff's attempt to enjoin recoupment was not collateral to a claim for benefits:

> [T]he Court disagrees with plaintiff's
> characterization of its request to enjoin the
> recoupment process pending appeal of the
> overpayment decisions as being merely
> collateral to a claim for benefits. By
> requesting such relief, plaintiff is
> essentially urging this Court to set aside
> agency regulations allowing fiscal
> intermediaries to immediately start the
> recoupment process after an overpayment
> determination has been made. Such an action
> would directly affect plaintiff's Medicare
> Benefits; thus, benefits are not a collateral
> issue in this instance.

*Great Rivers*, 170 F.Supp.2d at 905 (citation omitted); *see also*

*Cathedral Rock of N. Coll. Hill, Inc. v. Shalala*, 223 F.3d 354, 363

(6th Cir. 2000) (holding that plaintiff's claim was not collateral

"because a favorable resolution of [its] claim would result in the

reinstatement of its Medicare provider agreement.").

As in *Great Rivers*, Dr. Griego's complaint is fundamentally a

claim for Medicare benefits and thus is not collateral to such a

claim. Although Dr. Griego sues for money damages rather than

Medicare benefits, the money damages he seeks would compensate him

for TrailBlazer's premature recoupment, which is a process of

withholding present or future Medicare benefits to reduce Dr.

Griego's overpayment indebtedness. *See* 42 C.F.R. § 405.370 (2007).

Thus Dr. Griego's claim for money damages is an indirect suit for

Medicare benefits. Similarly, if Dr. Griego succeeds in obtaining

injunctive or declaratory relief, defendants would be prevented

from recouping the alleged overpayment, thus giving Dr. Griego a

greater entitlement to present or future Medicare benefits. It is

therefore clear that Dr. Griego's complaint is not collateral to a claim for Medicare benefits.

D

Requiring Dr. Griego to channel his claims through the entire administrative proceedings would not be futile. As the court has concluded above, it appears that the administrative procedures under § 1395ff permit HHS to adjudicate Dr. Griego's claims for unlawful recoupment. Thus the policies underpinning the channeling requirement are served by Dr. Griego's proceeding through the administrative appeals process under § 1395ff. This is true irrespective of his prospects for success on appeal. But to the extent his chances for recovery through the administrative appeals process are germane, *see Ringer*, 466 U.S. at 619 (in concluding that exhaustion would not be futile, rejecting plaintiffs' argument that their likelihood of recovery in the administrative proceedings was slim), HHS's proposed regulation pursuant to § 1395ddd(f)(2)(A), it should be noted that, contrary to defendants' litigation position, the Secretary has signaled his intent to adopt the same interpretation of § 1395ddd(f)(2)(A) that Dr. Griego advances.[7] *See Limitation on Recoupment of Provider and*

---

[7]In their motions to dismiss, defendants argue that § 1395ddd(f)(2)(A)'s prohibition of recoupment is inapplicable until the provider seeks a reconsideration. Under defendants' construction of § 1395ddd(f)(2)(A), a Medicare contractor such as TrailBlazer can recoup alleged overpayments even after receiving a request for redetermination (the first level of appeal under § 1395ff), but would be obligated to return recouped overpayments

- 26 -

*Supplier Overpayments*, 71 Fed. Reg. 55404, 55407 (proposed Sept. 22, 2006) (to be codified at 42 C.F.R. pt. 405). The fact that HHS has competence to adjudicate Dr. Griego's illegal recoupment claims, and the fact that it has publicly advocated an interpretation of § 1395ddd(f)(2)(A) that would entitle Dr. Griego to recover on these claims, further undercut his argument that exhaustion would be futile.

E

Dr. Griego argues that if defendants are not immediately restrained from illegally recouping the alleged overpayments, he will suffer irreparable injury in that he will be forced to shut down his Medicare/Medicaid-only health clinic, its employees will

---

to a provider who has requested a reconsideration (the second level of appeal). In a September 22, 2006 proposed rule, HHS acknowledges that the language of § 1395ddd(f)(2)(A) permits the construction that defendants have adopted in this lawsuit: "Based on the statutory language, we could recoup during the period in which the provider is actively pursuing an appeal at this first level [i.e., redetermination]." 71 Fed. Reg. 55404, 55407. But the Secretary now proposes rejecting this construction in favor of the one Dr. Griego urges:

> Although legally permissible, we believe this is inconsistent with Congressional intent. Instead, we propose in this rule *to cease recoupment when a valid first level appeal is received* . . . . A provider who acts in a timely fashion can preclude any recoupment until the QIC decision is rendered as contemplated under the [Medicare Prescription Drug, Improvement, and Modernization Act of 2003].

*Id.* (emphasis added).

lose their jobs, and its patients will be in danger of not receiving proper medical care.

The irreparable injury factor does not account for past injuries but only considers those harms that will ensue from requiring Dr. Griego to exhaust his administrative remedies. *See Kaiser*, 347 F.3d at 1115 ("[*P*]*ast* injury does not meet the irreparability requirement for waiver. The claimant must show that denial of relief *will cause* a harm."). Despite the parties' disputed construction of § 1395ddd(f)(2)(A), they agree that, after a reconsideration determination is rendered, a Medicare contractor may legally recoup alleged overpayments even though it may later be found that the overpayment determination was in error. Even if Dr. Griego were immediately successful in this suit in obtaining an injunction restraining defendants from recouping the alleged overpayment, the injunction would bind defendants only until a reconsideration was rendered, because Dr. Griego does not in his complaint challenge the underlying overpayment determination. Thus it is necessary that the irreparable injury on which Dr. Griego relies be caused by having the alleged overpayment of $487,708.19 recouped between the present and the date on which the reconsideration is rendered. This is so because any injury flowing from recoupment before or after this period could not have been caused by the channeling requirement.

Dr. Griego avers in his complaint that TrailBlazer rendered

its redetemination on September 13, 2007.  Although at the time of his complaint Dr. Griego had not yet filed for a reconsideration, he indicates in his response brief that he filed for a reconsideration with a QIC on January 7, 2008, which the QIC received on January 9, 2008.  Absent an exception, a QIC must render a reconsideration "[w]ithin 60 calender days of the date the QIC receives a timely filed request for reconsideration[.]"  42 C.F.R. § 405.970 (2007).  Based on Dr. Griego's factual allegations, the QIC has likely already rendered a reconsideration. Consequently, exhausting his administrative remedies would cause him no injury.  But even if the QIC has not yet rendered a reconsideration, Dr. Griego has provided no reason why the QIC reviewing his reconsideration request would not issue its decision within a reasonable time.  Thus Dr. Griego will not suffer irreparable injury by being forced to exhaust his administrative remedies.

Assuming *arguendo* that exhausting Dr. Griego's administrative remedies would force him to shut down his health clinic, this harm would not constitute irreparable injury.  "[E]ven if the Secretary's actions were to force a health care provider out of business, the injuries are not necessarily 'irreparable,' considering the risk known to the health care provider when it enters the Medicare program.  Therefore, in the present case, the companies' allegations of financial doom, even if they were

- 29 -

substantiated, which they are not, would not necessarily warrant judicial waiver of the exhaustion requirement." *Manakee Prof'l Med. Transfer Serv.*, 71 F.3d at 581. Therefore, the fact that Dr. Griego's clinic might go out of business does not establish irreparable injury.

Dr. Griego's bare assertion that, if his clinic closes its doors, his patients will be without medical care, does not adequately plead irreparable injury. In *Affiliated* the Fifth Circuit rejected a healthcare provider's argument that, if it were to shut down, its patients would be left without medical care. *Affiliated*, 164 F.3d at 286 ("[I]t seems highly unlikely that the termination of [plaintiff's] provider status would result in a measurable loss of home-based health care in three separate counties. Similarly, it seems unreasonable to conclude that [plaintiff's] patients will be deprived of adequate home-based health care if [plaintiff] is forced out of business."). Thus without greater factual enhancements to Dr. Griego's claim that his patients will be without medical care if his clinic shuts down, he has failed to sufficiently plead that he will suffer irreparable injury if he is forced to exhaust his administrative appeals.

None of the *Mathews* factors supports granting a judicial waiver of § 405(g)'s channeling requirement. Because Dr. Griego has failed to exhaust his administrative remedies, the court lacks subject matter jurisdiction.

By repeatedly referring throughout his complaint to a clandestine HHS policy that encourages illegal, premature recoupment against § 1395ddd(f)(2)(A), Dr. Griego relies on *City of New York* to attempt to establish a *Mathews* waiver. In *City of New York* the plaintiffs brought a due process challenge based on an alleged clandestine, internal HHS policy that had the effect of denying them disability benefits. *City of New York*, 476 U.S. at 469. "The gravamen of [plaintiffs'] complaint was that [HHS] had adopted an unlawful, unpublished policy under which countless deserving claimants were denied benefits." *Id.* at 473. The court held that all of the *Mathews* factors counseled in favor of granting a waiver of § 405(g)'s exhaustion requirement. *Id.* at 483-484.

Dr. Griego unsuccessfully attempts to cast his complaint under the rubric of *City of New York*. In that case, the plaintiffs alleged that their due process rights had been violated because the unpublished agency rule that ultimately denied them benefits was not formulated according to the normal procedures of the Administrative Procedures Act. *Id.* at 473-74. Thus the plaintiffs attacked the process by which the clandestine rule was formulated, not the agency's decision to deny them Medicare benefits based on the unpublished rule. Conversely, Dr. Griego's due process claims are all directed at the act of illegal recoupment, in violation of a Medicare statutory provision. None of Dr. Griego's due process

claims is tied to the formation of the allegedly clandestine agency policy directing others to recoup overpayments in violation of § 1395ddd(f)(2)(A). Thus Dr. Griego's due process claims are categorically different from those brought in *City of New York*, and this distinction significantly affects the analysis of the *Mathews* factors. *See id.* at 483-84.

Dr. Griego characterizes his suit as a challenge to a clandestine HHS policy. But when his complaint is shorn of its constitutional coating, Dr. Griego essentially alleges that, by encouraging premature recoupment of overpayments, HHS and the companies and agencies under it have failed to follow a correct construction of § 1395ddd(f)(2)(A). The *City of New York* Court clearly distinguished this type of case as one that should be channeled through the administrative process: "This case is materially distinguishable from one in which a claimant sues in district court, alleging mere deviation from the applicable regulations in his particular administrative proceeding." *Id.* at 484; *see also Abbey*, 978 F.2d at 45 ("The policies favoring exhaustion are most strongly implicated by actions (like this one) challenging the application of concededly valid regulations."). *City of New York* and *Abbey* speak of cases in which the plaintiff complained of deviations from valid regulations, but their reasoning also applies to cases, such as this one, where the plaintiff alleges a deviation from a concededly valid statutory

provision.

Dr. Griego's repeated reference to a clandestine agency policy against § 1395ddd(f)(2)(A) does not change the basic nature of his claim, i.e., that the defendants deviated from a proper understanding of § 1395ddd(f)(2)(A) in applying this statutory provision to him. If references to a clandestine agency policy were sufficient to remove a complaint such as Dr. Griego's from the administrative appeals process and allow it to be prosecuted in federal district court, plaintiffs would be able to circumvent the broad reach of § 405(g)'s channeling requirement by artful pleading for cases that are the grist of the administrative appeals process. Dr. Griego has failed to fit his case within the scope of *City of New York*.

*        *        *

Accordingly, the court grants defendants' December 21, 2007 and January 10, 2008 Rule 12(b)(1) motions to dismiss. For the reasons stated, it follows that the court also lacks subject matter jurisdiction over Dr. Griego's claims against defendant John Doe. Therefore, the claims against all defendants are dismissed without

prejudice by judgment filed today.  Dr. Griego's January 8, 2008
motion for class certification is denied as moot.

      **SO ORDERED.**

May 16, 2008.

                                        _____
                                        SIDNEY A. FITZWATER
                                        CHIEF JUDGE